UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GERARD EBERL and JEANNE EBERL,

                      Plaintiffs,

v.                                                    **DECISION AND ORDER**
                                                              09-CV-703S

FMC CORPORATION,

                      Defendant,
_____

FMC CORPORATION,

                      Third-Party Plaintiff,

v.

JOHN W. DANFORTH CO., INC.,

                      Third-Party Defendant.

## I. INTRODUCTION

Plaintiffs commenced this action seeking damages for injuries sustained by Plaintiff Gerard Eberl ("Plaintiff"[1]) while working at a chemical plant owned by Defendant/Third-Party Plaintiff FMC Corporation. FMC Corporation filed a third-party action against Plaintiff's employer, John W. Danforth Co., Inc., seeking contractual indemnification for any damages. Presently before this Court are the Motions for Summary Judgment of Defendant FMC Corporation,[2] seeking dismissal of Plaintiffs' complaint, and of Third-Party

---

[1] Plaintiff Jeanne Eberl's claim is derivative.

[2] In support of this motion (Docket No. 48), FMC Corporation submitted the Affirmation of Francis F. Quinn, Esq., with Exhibits A - I, a Statement of Undisputed Facts (Docket No. 48-12), and a supporting Memorandum of Law (Docket No. 48-13). Plaintiffs opposed the motion with the Declaration of Catherine M. Beltz, Esq., with Exhibits A-R (Docket No. 53), the Affidavit of Daryl J. Smith, P.E., with Exhibits A-C

1

Defendant John W. Danforth Co., Inc.,[3] seeking dismissal of the third-party complaint. Plaintiffs have also moved for Partial Summary Judgment[4] seeking dismissal of the affirmative defenses of assumption of the risk. These motions are fully briefed and the Court finds oral argument unnecessary. For the reasons that follow, the summary judgment motion of FMC Corporation is granted in part, the summary judgment motion of John W. Danforth is denied, and Plaintiffs' motion for partial summary judgment is granted.

## II. BACKGROUND

Plaintiff was working as a steamfitter for Third-Party Defendant John W. Danforth Co., Inc. ("Danforth"), in August 2006. Deposition of Plaintiff Gerard Eberl at 45-50 (Leary Aff Ex E, Quinn Aff Ex B, Beltz Decl Ex B). Danforth had been contracted by Defendant FMC Corporation ("FMC") to perform certain work associated with a steam generator project, including the removal of a deaerator from the old boiler room and the transfer of same to the new boiler room. Deposition of Frederick Koch at 32, 44 (Leary Aff Ex L, Quinn Aff Ex E, Beltz Decl Ex E); see Leary Aff Ex V. Plaintiff was assigned by his Danforth foreman, Frederick Koch, to disconnect a steam line running into this deaerator

---

(Docket No. 53-19), a Statement of Undisputed Facts (Docket No. 53-20), and an Opposing Memorandum of Law (Docket No. 53-21). FMC filed a Reply Memorandum of Law (Docket No. 54).

[3]In support of this motion (Docket No. 47), Third-Party Defendant John W. Danforth submitted the Affidavit of Robert D. Leary, Esq., with Exhibits A-V, a supporting Memorandum of Law (Docket No. 47-25), and a Statement of Undisputed Facts (Docket No. 47-12). Third-Party Plaintiff FMC Corporation opposed this motion with an opposing Memorandum of Law and Exhibits A-E (Docket No. 52), a Statement of Undisputed Facts, and a Reply Statement of Undisputed Facts. Plaintiffs also responded with the same opposing documents as submitted in opposition to FMC's motion for summary judgment (Docket No. 53). Danforth filed reply Memoranda of Law in response to both FMC's and Plaintiffs' submissions, as well as reply Affidavits of Robert D. Leary, Esq. (Docket No. 55).

[4]In support of their motion, Plaintiffs submitted the Declaration of Catherine Mary Beltz, Esq., with Exhibits A-R (Docket Nos. 49, 50), a supporting Memorandum of Law (Docket No. 49-2), and a Statement of Undisputed Facts (Docket No. 49-3).

by unbolting a flange on the line, placing a blank flange and then cutting the pipe with an oxyacetylene torch. Plaintiff Dep at 30, 61; Deposition of Shawn Piskorz at 61-62, 89 (Leary Aff Ex M, Beltz Decl Ex C); Koch Dep at 21, 30; Deposition of Jason Vaughan at 173 (Leary Aff Ex F, Beltz Decl Ex D). FMC employees were responsible for 'locking out' the active steam line prior to this task being performed. Vaughan Dep at 28-29, 133, 170; Deposition of Michael Brigante at 35, 95 (Leary Aff Ex k, Quinn Aff Ex F, Beltz Decl Ex F).

   In order to remove part of the steam line, Plaintiff and steamfitter apprentice Shawn Pixkorz utilized a scissor lift to reach the requisite pipe located approximately 17 to 18 feet off the ground. Plaintiff Dep at 60, 66-67; Vaughan Dep at 201, 214-215. They loosened the bolts on the flange after being informed by Koch and FMC project manager Jason Vaughan that the line was 'all set' and 'ready to go.' Plaintiff Dep at 66-67, 80; Piskorz Dep at 62-63. After the bolts were loosened, Plaintiff noticed water dripping, specifically hot condensate which forms as the steam in the line begins to cool, and he informed Vaughan and Koch of that fact. Plaintiff Dep at 69-71; Vaughan Dep at 173-174, Brigante Dep at 58. Vaughan and Koch had a brief conversation, following which Plaintiff was told that it was just "residual" liquid. Plaintiff Dep at 71-76; Piskorz Dep at 91, 120, 122. The residual water drip stopped a few minutes later, and Plaintiff continued to remove bolts. Plaintiff Dep at 76. Plaintiff cut a window in the pipe with the torch, and the inside appeared dry. Id. at 83-85. When Plaintiff started to cut the bottom of the pipe, however, water again dripped out. Plaintiff Dep 87; Piskorz Dep 106-107. Plaintiff and Piskorz came down off the scissor lift and informed the FMC and Danforth supervisors. Plaintiff Dep at 89-90. Vaughan then had an FMC employee recheck the valves. Plaintiff Dep at 89-91; Piskorz Dep at 120. That employee returned and informed Vaughan that the valves were tightened

as much as possible without snapping the valve stems. Plaintiff Dep at 91-92. After another conversation between Vaughan and Koch, Koch told Plaintiff that they "should be all set. We got you drained and all set. Valve shut." Plaintiff Dep at 92.

Plaintiff and Piskorz took the lift back up and saw that the water had stopped dripping. Plaintiff Dep at 93. Plaintiff checked the window in the pipe again, confirmed that the pipe was dry, and continued to cut. Id. at 94. When Plaintiff made the final cut, however, the pipe shifted and "[w]ater started spraying everywhere." Plaintiff Dep at 99, 104; Piskorz Dep at 91, 155-156; Vaughan Dep at 206-207. Plaintiff handed off the cutting torch to Piskorz, climbed over the railing on the scissor lift, and jumped onto nearby piping, from which he then fell to the ground. Plaintiff Dep at 105-106, 109-110; Piskorz Dep at 157; Vaughan Dep at 207-208. As a result, Plaintiff suffered second and third degree burns as well as injuries to his shoulder, knee, and hip. Quinn Aff Ex I at 6.

Plaintiff commenced the present action in the Supreme Court for the State of New York, Erie County, asserting causes of action against FMC for negligence and violations of New York Labor Law §§ 200, 240, and 241, as well as a derivative claim on behalf of Plaintiff's wife for loss of consortium. Complaint, Docket No. 1, Ex. A. FMC removed the action to this Court, asserting diversity grounds. Docket No. 1. FMC requested and was granted leave to file a third-party complaint against Danforth, wherein FMC asserted that Danforth was contractually obligated to indemnify FMC for any damages in the event FMC is found liable to Plaintiffs. Docket No. 16.

### III. DISCUSSION

Summary judgment is appropriate where the materials in the record, including depositions, documents, affidavits or declarations, and stipulations, show that there are no

4

genuine issues regarding any material fact and that the movant is entitled to judgment as a matter of law.  see FED.R.CIV.P. 56 (a), (c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**A.     Labor Law § 240**

FMC and Danforth both argue that Plaintiffs cannot establish a violation of Labor Law § 240. FMC Mem of Law, Docket No. 48-13, at 2-3; Danforth Mem of Law, Docket No. 47-25, at 15-16.  Paragraph one of this section requires that, as relevant, contractors and owners:

> in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

"Labor Law § 240(1) imposes a nondelegable duty and absolute liability upon owners or contractors for failing to provide safety devices necessary for protection to workers subject to the risks inherent in elevated work sites who sustain injuries proximately caused by that failure." Jock v. Fein, 80 N.Y.2d 965, 967-968 (N.Y. 1992); see Agriculture Ins. Co., Inc. v. Ace Hardware Corp., 214 F.Supp.2d 413, 417 (S.D.N.Y. 2002)(liability may be found even if the owner or contractor did not supervise or control the work).  The "jurisprudence defining the category of injuries that warrant the special protection of Labor Law § 240(1)

5

has evolved over the last two decades, centering around a core premise: that a defendant's failure to provide workers with adequate protection from reasonably preventable, gravity-related accidents will result in liability." Wilinski v. 334 East 92nd Hous. Dev. Fund Corp., 18 N.Y.3d 1, 7 (N.Y. 2011); see Runner v New York Stock Exch., Inc., 13 N.Y.3d 599, 604 (N.Y. 2009)(this section protects against injuries resulting from the operation of gravity upon the worker or upon objects falling on that worker).

     Here, Plaintiff was working approximately 17 to 18 feet off the ground on a 20 inch by 8 foot scissor lift platform at the time of his accident. Plaintiff Dep at 66; Vaughan Dep at 214-215. There is no allegation that the scissor lift itself was defective or inadequate protection from the risk of falling. The scissor lift platform was surrounded with a railing, over which Plaintiff climbed in order to reach adjacent piping and then drop to the ground. Plaintiff Dep at 83, 109; Vaughan Dep at 207-208, 213-214; Piskorz Dep at 157. Plaintiff specifically testified that he "jumped." Plaintiff Dep. at 109-110; see George v. State of New York, 251 A.D.2d 541, 542 (NY App Div 2d Dept 1998), lv denied 92 N.Y.2d 815 (N.Y. 1998)(no Labor Law § 240 violation where injuries resulted from "jump rather than from any defective piece of equipment designed to prevent injuries from elevation related risks"). Thus, "[P]laintiff's injury-producing accident was not attributable to the risk arising from the elevation differentials at his work site that brought about the need for the safety device in the first place," but instead was the result of the separate hazard of hot steam condensate emanating from the cut pipe, prompting Plaintiff's decision to jump from the scissor lift platform. Fenty v City of New York, 71 A.D.3d 459, 460 (N.Y. App. Div. 1st Dept 2010)(no Labor Law 240 violation where hot steam from ruptured pipe led to decision to jump from bucket lift); see Cohen v. Mem. Sloan-Kettering Cacer Ctr., 11 N.Y.3d 823, 825 (N.Y.

2008)(no liability where injury results from "separate hazard wholly unrelated to the risk" prompting need for safety device in first place). To put it another way, the risk of being burned is not one that Labor Law § 240 is intended to guard against.

Contrary to the cases on which Plaintiffs rely, Plaintiff's injuries resulted from a hazard unrelated to an elevation risk, and not from a defective or improperly placed safety device designed to protect against gravity related risks. Pl's Opposing Mem of Law, Docket No. 53-21, at 2-8; see e.g. see Kirbis v. LP Ciminelli, Inc., 90 A.D.3d 1581, 1582 (N.Y. App Div 4th Dept 2011)(improperly placed ladder buckled, twisted, and collapsed); Vukovich v. 1345 Fee, LLC, 61 A.D.3d 533, 533-534 (N.Y. App Div 1st Dept 2009)(unsecured A frame insufficient to prevent plaintiff's fall after being shocked); Nimirovski v. Vornado Realty Trust Co., 29 A.D.3d 762, 762-763 (N.Y. App Div 2d Dept 2006)(scaffold insufficient protection where falling metal caused it to shake and pull away from the wall, leading to plaintiff's fall); Landgraff v. 1579 Bronx Riv. Ave., LLC, 18 A.D.3d 385, 386 (N.Y. App Div 1st Dep't 2005)(scaffolding was too small and light, allowing it to be flipped over when hit by swinging metal pipe). Because there is no allegation of defect in or improper placement of the scissor lift, the gravity-related safety device at issue here, there is no viable claim for a Labor Law § 240 violation.

**B.   Labor Law § 241**

Plaintiff alleges that FMC violated Labor Law § 241 (6), which requires contractors and owners to ensure that "[a]ll areas in which construction, excavation or demolition work is being performed [are] so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places." Like section 240, Labor

Law § 241 "imposes a nondelegable duty of reasonable care upon an owner or general contractor to provide reasonable and adequate protection to workers on the premises," Venezia v. State of New York, 57 A.D.3d 522, 522 (N.Y. App Div 2d Dept 2008).  An owner or general contractor is therefore liable for damages "for injuries sustained due to another party's negligence in failing to conduct their construction, demolition or excavation operations so as to provide for the reasonable and adequate protection of the persons employed therein." Rizzuto v. L.A. Wenger Contr. Co., 91 N.Y.2d 343, 350 (N.Y. 1998)(emphasis removed).  "In order to establish liability under Labor Law § 241(6), a claimant is required to establish a breach of a rule or regulation of the Industrial Code which gives a specific, positive command." Venezia, 57 A.D.3d at 522, citing Singleton v. Citnalta Constr. Corp., 291 A.D.2d 393, 394 (N.Y.App Div 2d Dept 2002).

"Labor Law § 241(6) only provides protection 'to persons employed in, or lawfully frequenting, all areas in which construction, excavation or demolition work is being performed' " Coyago v. Mapa Props., 73 A.D.3d 664, 664 (N.Y. App Div 1st Dept 2010), lv denied 15 N.Y.3d 708 (N.Y. 2010), quoting Rizzuto, 91 N.Y.2d at 348.  FMC and Danforth dispute whether Plaintiff was engaged in demolition work at the time of his accident.  Pursuant to the New York Industrial Code, specifically 12 NYCRR 23-1.4 (b)(16), demolition work is defined as "work incidental to or associated with the total or partial dismantling or razing of a building or other structure *including the removing or dismantling of machinery* or other equipment" (emphasis added).  Here, Danforth employees were engaged in the dismantling and removal of a deaerator from the old boilerhouse and the transfer of same into the new boilerhouse. Koch Dep at 32, 44, 47, 63-64; Vaugh Dep at 94; Quinn Aff. Ex. C.  In order to accomplish this, Plaintiff was tasked with cutting the

steam line in the deaerator room of the old boilerhouse. Koch Dep at 63, 74-75; Plaintiff Dep at 61. This is analogous to the removal and dismantling of a subway rail in order to make way for a new track, which has been held to constitute 'demolition' pursuant to the regulations. Medina v. City of New York, 87 A.D.3d 907, 909 (N.Y. App Div 2011); see Wade v. Atlantic Cooling Tower Servs., Inc., 56 A.D.3d 547, 549 (N.Y. App Div 2d Dept 2008)(demolishing part of a sprinkler system attached to cooling tower constituted demolition within the meaning of Labor Law § 241(6)).

     Moreover, FMC does not dispute Plaintiff's contention that the work at issue falls within the regulatory definition found in New York's Industrial Code, but instead argues that the regulatory definition is overly broad when compared to the more narrowly tailored language of the statute itself.  Reply Mem of Law, Docket No. 54, at 5-6. This argument is without merit.  Other Labor Law provisions, including subsections one through five of Labor Law § 241, are "self-executing in the sense that they may be implemented without regard to external considerations such as rules and regulations." Ross v. Curtis-Palmer Hydro-Electric Co., 81 N.Y.2d 494, 503 (N.Y. 1993)(internal quotation marks omitted). Labor Law § 241 (6), however, "require[s] reference to outside sources to determine the standard by which a defendant's conduct must be measured." Id (internal quotation marks omitted).  Thus, "the definitions provided in the Industrial Code may be relied on to interpret the statutory language." DaBolt v. Bethlehem Steel Corp., 92 A.D.2d 70, 74 (N.Y. App Div 4th Dept 1983), appeal and lv dismissed 60 N.Y.2d 554, 701 (N.Y. 1983). The fact that the regulatory definition gives a liberal interpretation to the phrase "constructing or demolishing buildings" in Labor Law § 241 "is not at odds with the intent of the [New York] Legislature to protect workmen engaged in hazardous occupations and is in keeping with the liberal

interpretation which has been afforded by the courts." DaBolt, 92 A.D.2d at 74.

Further, 12 NYCRR 23-3.2 (a)(2) is sufficiently specific and applicable to the facts of this case to support the claim under Labor Law § 241(6). See Ross, 81 N.Y.2d at 502; Bald v. Westfield Academy, 298 A.D.2d 881, 882 (N.Y. App Div 4th Dept 2002). This regulation requires that "[b]efore demolition is started, all . . . water[ and] steam . . . supply lines shall be shut off and capped or otherwise sealed." 12 NYCRR 23-3.2 (a)(2). It is readily apparent that one of the hazards this regulation is intended to prevent is the accidental scalding or burning of a worker during demolition of or near such an active line. See generally Garcia v. 225 East 57th St. Owners, Inc., __ A.D.3d __, 2012 WL 1432388, *3-4 (N.Y. App Div 1st Dept Apr 26, 2012). Inasmuch as it is undisputed that Plaintiff was burned by hot condensate from the steam line, FMC has not established its entitlement to summary judgment on Plaintiff's Labor Law § 241 (6) claim.

The same conclusion cannot be reached with respect to the remaining Industrial Code regulations cited by Plaintiff. See Quinn Aff Ex I at 16. Section 23-3.2 (a)(3) requires that the water and steam lines themselves be protected from damage during demolition, and as FMC argues, Plaintiff was tasked with cutting that line. See Garcia, 2012 WL 1432388 at *4 (regulation requiring loose objects be braced inapplicable where plaintiff was injured by mirror he was tasked with dislodging). There is no violation of the requirement to *provide* ample drains where FMC personnel admitted that there were possible ways of draining the line.12 NYCRR 14-9.30; Vaughan Dep at 110-111, 130-131; see Deposition of Gary Stahl, Leary Aff Ex S, at 166-167. Although Plaintiff was using an oxyacetylene torch to cut the pipe, his accident was unrelated to welding, and therefore those regulations are not factually applicable. See 12 NYCRR 14-3.6; 23-1.25. Further, Plaintiff himself

10

testified that waterproof clothing was not appropriate while welding, Plaintiff Dep. at 191-192; see 12 NYCRR 23-1.8 (c)(3), and Plaintiffs do not dispute FMC's assertion that neither steam nor the resulting condensate constitutes a corrosive substance. See 12 NYCRR 23-1.7 (h); 23-1.8 (c)(4).  Finally, the requirement in 12 NYCRR 4-7.4 that "[s]afety controls . . . be properly adjusted and maintained" is too general a standard to constitute the specific, positive command required by Labor Law § 241 (6). See Venezia, 57 A.D.3d at 522.

**C.    Labor Law § 200 and Common Law Negligence**

"Section 200 of the Labor Law is a codification of the common-law duty of a landowner to provide workers with a reasonably safe place to work." Lombardi v. Stout, 80 N.Y.2d 290, 294 (N.Y. 1992).  Liability for a violation of § 200 may be imposed in two different situations: (1) where the owner created the dangerous condition that caused the accident or had actual or constructive notice of that dangerous condition; or (2) where the accident was the result of the manner in which the work was performed.  Ortega v. Puccia, 57 A.D.3d 54, 61 (N.Y. App Div 2d Dept 2008); Bannister v. LPCiminelli, Inc., 93 A.D.3d 1294, 1294-1295 (N.Y. App. Div. 4th Dept 2012). With respect to this second situation, "when a claim arises out of alleged defects or dangers in the methods or materials of the work, recovery against the owner or general contractor cannot be had under Labor Law § 200 unless it is shown that the party to be charged had the authority to supervise or control the performance of the work." Ortega, 57 A.D.3d at 61; Selak v. Clover Mgmt., Inc., 83 A.D.3d 1585, 1587 (N.Y. App Div 4th Dept 2011).  Plaintiffs argue that FMC's liability is found under the first scenario, asserting that this is a premises liability case, whereas FMC argues that it cannot be held liable because Plaintiff's accident resulted from the manner

11

in which the work was conducted by Danforth.  Regardless of the theory applied, FMC is not entitled to summary judgment on this claim.

Initially, FMC concedes that hot condensate was a common by-product in the steam delivery system,  FMC personnel controlled the shutdown of that system, and that FMC personnel were aware that "shutting down the system did not instantaneously remove all hazardous material from the system." FMC Mem of Law at 6; FMC Reply Mem of Law at 7.  Indeed, FMC's written policies specifically recognize that "[t]he plant steam distribution has the potential to be dangerous," Beltz Decl Ex J, Docket No. 53-10, at 19 (FMC Tonawanda Safety and Health Policies: Contractor Safety Orientation), and therefore requires operators to "drain lines, as needed," and "[r]elease potentially hazardous stored or residual energy from the equipment."  Beltz Decl Ex K, Docket No. 53-11, at 4 (FMC Tonawanda Safety and Health Policies and Procedures: Lockout/Tagout, §§ 3.2.3, 3.2.6). Constructive notice of the dangerous condition is therefore admitted. See David v. New York City Hous. Auth., 284 A.D.2d 169, 171 (N.Y. App Div 1st Dept 2001)(knowledge of reoccurring dangerous condition places defendant on constructive notice of same).  FMC nonetheless argues that its personnel were only responsible for stopping the active flow of steam by shutting the valves, and they "were neither intended nor expected to drain the pipes" as part of the lock-out procedure.   FMC Reply Mem of Law at 7.  This assertion that Danforth employees were in charge of the manner and method in which the steam line was to be further deenergized is belied by the record.  FMC policy states that lockout procedures must be conducted by FMC employees absent express consent to the contrary. See Beltz Decl Ex J, Docket No. 53-10, at 14. FMC personnel, including the plant manager, safety coordinator, and the operator assigned to lockout the steam line on the

day of Plaintiff's accident, testified that draining a line of residual thermal energy such as steam or condensate was a necessary step in the lockout procedure. Deposition of Michael Chaney, Beltz Decl Ex L, at 161; Deposition of Dominic Montante, Beltz Decl Ex M, Leary Aff Ex O, at 10, 30, 41-44, 81; Brigante Dep at 61, 72; <u>see also</u> Deposition of Rene Alvarez, Beltz Decl Ex N, at 69-70.  Further, Vaughan specifically testified that FMC operators were conducting the lockout of the steam lines on the day of the accident, and that he "would not have had [Danforth employees] responsible for any type of deenergization." Vaughan Dep. 28-29, 133, 170.  FMC safety coordinator Dominic Montante similarly stated that contractors were not to touch FMC equipment. Montante Dep at 10, 145.  Finally, FMC itself submitted a copy of the report of Plaintiffs' expert engineer, who concluded, among other things, that "FMC was responsible for removing the hazard of the residual thermal energy from the line prior to directing Danforth to proceed with the line breaking work, but they failed to do so." Quinn Aff Ex D at 25 (Engineer's Report of Daryl J. Smith, P.E.); <u>see</u> Leary Aff Ex D; Affidavit of Daryl J. Smith, P.E., Docket No. 53-19, at 3.

   Deposition testimony also supports the conclusion that Danforth employees were relying on FMC personnel to appropriately lockout the steam line. Plaintiff, Koch, and Piskorz each testified that he understood Vaughan's assertion that the line was "all set" and "ready to go" to mean the line had been drained of residual energy. Plaintiff Dep at 65, 92-93, 234; Koch Dep at 168-169; Piskorz Dep at 62-63, 78.  Plaintiff stopped working each time he encountered water, and it is undisputed that Vaughan assigned an FMC employee to do another check of the line. Plaintiff Dep at 71, 89-92; Vaughan Dep at 184-185; Piskorz Dep at 120, 125-126.  Vaughan also admitted that there were possible points

at which the steam line could have been 'broken' or that a strainer could have been adapted by FMC personnel to allow drainage. Vaughan Dep at 110-111, 130-131; Stahl Dep at 166-167. Further, plant manager Michael Chaney testified that "a lot of our equipment in Tonawanda is specifically designed to be drained," however, when questioned about compliance with FMC's policy for operators to drain lines of residual energy, Chaney answered "I don't believe the operator took that step." Chaney Dep at 158, 168-170. Chaney further conceded that "the lines were not drained." Chaney Dep at 208. FMC is therefore not entitled to summary judgment on Plaintiffs' Labor Law § 200/common law negligence claim.

### D.    Contractual Indemnity[5]

Danforth argues that it is entitled to summary judgment dismissing the third-party complaint against it because the indemnity provision in its contractor agreement with FMC is void pursuant to New York General Obligations Law § 5-322.1.[6] Danforth Mem of Law,

---

[5] FMC has not asserted a claim for common-law indemnity, and confirms as much in its Opposing Memorandum of Law, therefore this Court will consider only the arguments regarding contractual indemnity.

[6] General Obligations Law § 5-322.1 (1) states:

> A covenant, promise, agreement or understanding in, or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenances and appliances including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property contributed to, caused by or resulting from the negligence of the promisee, his agents or employees, or indemnitee, whether such negligence be in whole or in part, is against public policy and is void and unenforceable; provided that this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by an admitted insurer. This subdivision shall not preclude a promisee requiring indemnification for damages arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of a party other than the promisee, whether or not the promisor is partially negligent.

14

Docket No. 47-25, 10-14; see Leary Aff. Ex V (Purchase Order and Supplemental Terms). "General Obligations Law § 5–322.1 was enacted to void indemnification agreements [in construction, alteration, repair or maintenance contracts] that seek to exempt the indemnitee from liability based on negligence, irrespective of whether that negligence is wholly or only partially the cause of the injury." Cavanaugh v. 4518 Assocs., 9 A.D.3d 14, 20 (N.Y. App Div 1st Dept 2004).

In the instant case, two contractual provisions speak to indemnification. Paragraph 23 of the relevant Purchase Order states that Danforth, as the Seller, "agrees to defend, indemnify and save the buyer [FMC] harmless against all liabilities, claims or demands whether in tort or in contract for injuries or damages to any person or property arising out of Seller['s] act[s] or omissions in the performance of this contract." Section 27 of the Supplemental Terms and Conditions further provide that:

> CONTRACTOR shall indemnify and save harmless FMC, its officers, directors, employees and agents from and against any and all claims, liabilities, obligations, suits and causes of action entered, suffered or incurred, arising directly or indirectly out of or in connection with the injury to or death of any and all persons . . . resulting or claimed to have resulted, directly or indirectly, from or in connection with any and all accidents, occurrences, happenings or conditions arising out of the performance of the work under this Agreement by the CONTRACTOR or any SUBCONTRACTOR and their respective employees (except that CONTRACTOR shall not be held responsible for any claims attributable to the sole negligence of FMC, its officers, directors, employees or agents) and CONTRACTOR, at CONTRACTOR's expense, shall defend FMC, its officers, directors, employees and agents against any and all claims, suits and causes of action and shall pay all damages, costs and expenses including attorneys' fees, in connection with any matter or thing which the CONTRACTOR by the provisions of this Article is required to indemnify and save FMC harmless.

Leary Aff. Ex V.

Notably, because it is specifically stated in the Supplemental Terms that the conditions therein "shall control in the event that there is any inconsistency between them and the proposal, quotation, and/or the Terms and Conditions on the reverse side of any attached Purchase Order," this more specific provision will be considered first. Leary Aff, Ex V (§ 1). As written, the indemnification clause in the Supplemental Terms requires Danforth to indemnify FMC for all claims arising out of the work, with the only exception being for claims arising from the *sole* negligence of FMC. Thus, this provision requires Danforth to indemnify FMC even for injuries that FMC contributed to, caused, or that resulted from the partial negligence of FMC in violation of General Obligations Law § 5–322.1 (1).

The New York Court of Appeals has already rejected the argument that General Obligations Law § 5-322.1 should be read to "merely bar[] enforcement of the contract claims to the extent that they would require indemnification for that portion of the awards attributable to the negligence of the [proposed indemnitee]." Itri Brick & Concrete Corp. v. Aetna Cas. & Sur. Co., 89 N.Y.2d 786, 795 (N.Y. 1997). Instead, to prevent an otherwise improper indemnity clause from being rendered void by operation of § 5-322.1, there must be some "language limiting the subcontractor's obligation to that permitted by law or to the subcontractor's negligence." Itri Brick & Concrete Corp., 89 N.Y.2d at 795. Although this Court agrees with FMC that an indemnification provision need not specifically use the phrase 'to the fullest extent permitted by law" in order to be enforceable in a case of partial indemnification, no limiting language appears in the Supplemental Terms indemnification clause. See generally Brooks v. Judlau Contr., Inc., 11 N.Y.3d 204, 210-211 (N.Y.

2008)(holding that inclusion of the phrase 'to the fullest extent permitted by law" limits a promisor's obligation and contemplates partial indemnification).  Further, as discussed above, FMC personnel was responsible for the lockout of the steam delivery system, thus any negligence in the performance of that lockout is attributable to FMC. Cf. Lesisz v. Salvation Army, 40 A.D.3d 1050, 1051 (N.Y. App Div 2d Dept 2007)(an indemnification provision prohibited by § 5-322.1 may nonetheless be enforced if the indemnitee is free from any negligence). Therefore the indemnification provision found in the Supplemental Terms and incorporated by reference into the Purchase Order is unenforceable pursuant to General Obligations Law § 5-322.1.

Because the indemnification provision in the Supplemental Terms is void, however, there is no longer any conflict with the more limited indemnification clause included in the Purchase Order.  This clause requires Danforth to indemnify FMC for only those claims arising from Danforth's acts or omissions in performing the contract.  Leary Aff, Ex V. Thus, it does not purport to indemnify FMC for its own negligence and remains viable. See Ostuni v. Town of Inlet, 64 A.D.3d 854, 855 (N.Y. App Div 3d Dept 2009).  Because Danforth does not further argue that it is entitled to summary judgment on the third party complaint because it is free from any negligence, FMC's claim for contractual indemnity remains viable.

**E.    Assumption of the Risk**

Plaintiffs cross-moved for partial summary judgment dismissing any defense based upon Plaintiff's assumption of the risk.  Docket No. 49.  Defendants have not opposed this motion, either in responding papers or within the arguments in support of their own respective motions.   In any event, Plaintiffs' argument has merit. The doctrine of

17

assumption of the risk, either express or implied, requires a knowing and voluntary acceptance of a risk by a plaintiff, and is therefore inapplicable where, as here, an employee is directed to perform a task. Gleason v. Holman Contract Warehousing Inc., 263 A.D.2d 913, 915 (N.Y. App Div 3d Dept 1999). see also Lorefice v. Reckson Operating Partnership, L.P., 269 A.D.2d 572, 573 (N.Y. App Div 2d Dept 2000)(doctrine of primary assumption is inapplicable to a Labor Law § 241 (6) claim). Notably, "implied assumption of risk and contributory negligence are distinct legal theories," and as Plaintiffs concede, FMC is not precluded from presenting evidence that Plaintiff himself was negligent. McCabe v. Easter, 128 A.D.2d 257, 258-259 (N.Y. App Div 3d Dept 1999); see Lorefice, 269 A.D.2d at 573.

## IV.  CONCLUSION

Dismissal of Plaintiffs' Labor Law § 240 cause of action is warranted, and therefore FMC's motion for summary judgment is granted to that extent and otherwise denied. Danforth's motion for summary judgment dismissing the third party complaint is denied in its entirety. Finally, because the doctrine of assumption of the risk is inapplicable to this work-related accident, Plaintiffs' motion for partial summary judgment dismissing those affirmative defenses is granted.

## V.  ORDERS

IT HEREBY IS ORDERED that the Motion for Summary Judgment of Third-Party Defendant John W. Danforth Co., Inc. (Docket No. 47) is DENIED;

FURTHER, the Motion for Summary Judgment of Defendant FMC Corporation (Docket No. 48) is GRANTED IN PART and DENIED IN PART;

FURTHER, Plaintiffs' Motion for Partial Summary Judgment (Docket No. 49) is GRANTED;

SO ORDERED.

Dated: May 17, 2012
       Buffalo, New York

                                                    /s/William M. Skretny
                                               WILLIAM M. SKRETNY
                                                  Chief Judge
                                            United States District Judge